UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ROCHELLE LASHAY QUARLES,     )
     )
     Plaintiff,     )
     )
     vs.     )     Case No. 4:16 CV 1910 (JMB)
     )
NANCY A. BERRYHILL, [1] Acting     )
Commissioner of Social Security,     )
     )
     Defendant.     )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

In January 2014, plaintiff Rochelle Lashay Quarles filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of August 28, 2013.[2] (Tr. 138-46). After plaintiff's application for benefits was denied on initial consideration (Tr. 84-88), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 91-93).

Plaintiff and counsel appeared for a hearing on September 15, 2014. (Tr. 26-69). Plaintiff testified concerning her disability, daily activities, functional limitations, and past work.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

[2] This was the fourth application filed on plaintiff's behalf: An application for disabled child benefits was denied on initial review in 1998; the Appeals Council denied a second application for disabled child benefits in October 2011; and, in August 2013, plaintiff's application for disability insurance was denied on initial review. (Tr. 195).

The ALJ also received testimony from vocational expert Delores Gonzalez, M. Ed.  The ALJ issued a decision denying plaintiff's applications on November 4, 2015.  (Tr. 9-25).  The Appeals Council denied plaintiff's request for review on October 20, 2016.  (Tr. 1-3).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Application Documents, Education Records, and Hearing Testimony

Plaintiff was born on November 30, 1990, and was 22 years old when she filed her application.  She received special education services as a student and graduated from high school in May 2010.  (Tr. 176).  According to IEP documents prepared in December 2009, (Tr. 168-93), plaintiff was diagnosed with emotional disturbance (somatization and poor interpersonal relationships); specific learning disabilities (written expression, math calculation, and math reasoning); and language impairment (semantics and pragmatics).  Her medical diagnoses were Cluster B personality traits, panic disorder, depression, and agoraphobia.  (Tr. 169).  She was placed in regular education classes at least 80 percent of the time.  (Tr. 173).  According to a "re-evaluation" completed on December 1, 2008, plaintiff's cognitive abilities were in the borderline range, with a Verbal IQ of 69, a Performance IQ of 80, and a Full Scale IQ of 72.  (Tr. 170).  In addition to academic problems related to her learning diagnoses, plaintiff had poor self-confidence and self-image, had difficulties developing and maintaining peer relationships, manifested anxiety as physical symptoms, and struggled to maintain self-control when angry or upset.  (Tr. 169).  Although plaintiff's goal was to attend a two-year college, the IEP team identified a number of barriers, including difficulty completing required coursework at a passing level, maintaining self-control when frustrated, and difficulty working with peers.  Id.  It was the opinion of the team that she was best suited for a career in the service industry.  (Tr. 170).

Plaintiff attended St. Louis Community College between fall 2010 and spring 2014, with a one-year break after the 2012 spring semester. (Tr. 263). She received accommodations in spelling and math, and was given preferential seating, a volunteer note-taker, audio recordings of lectures, and extended time to take her exams in a reduced distraction environment. During her first semester, plaintiff earned B grades in four courses and withdrew from a pre-algebra course. (Tr. 264). Thereafter, her academic performance was quite variable. She withdrew from all her classes in the 2012 spring semester. In the next two semesters, she failed or withdrew from four courses, but she also received an A (Art Appreciation), one B (Stress Management), and two Cs (College Composition II and General Psychology). She failed or withdrew from all her classes in spring 2014. Id. She testified at the hearing that she was not allowed to re-enroll based on her academic performance and failure to complete a financial aid application. (Tr. 48).

According to a Work History Report plaintiff completed, she was a day care assistant from 2008 through 2009 and a campus worker from 2010 through 2011. (Tr. 216). Plaintiff had a part-time job at Wal-Mart as a stocker from October 2014 through March 2015 until she was terminated for excessive tardiness and absences. She testified that she was frequently late to her shift because relied on public transportation to get to work. (Tr. 51, 266). She also testified that the work was difficult because she had to lift heavy items and meet quotas. She had a part-time job at a Dairy Queen for two months in 2015, but was unable to make change or manage credit cards. She found the job very stressful. (Tr. 49-50). Her employer submitted a letter stating that plaintiff had a hard time focusing and made numerous errors in filling customers' orders. She also had "an attack of nerves" that left her unable to function for 30 minutes. (Tr. 267).

According to Function Reports completed by plaintiff and her mother (Tr. 208-15, 228-38), plaintiff spent her days attending to personal hygiene, watching television, and talking to

family members. She attended church with her mother. She was able to microwave prepared foods. She was responsible for making her bed, taking out the trash, and washing dishes. She went shopping with her mother and was able to go out alone on occasion. She was unable to count change, pay bills, or manage bank accounts. She sometimes had problems getting along with others because, she stated, she "tend[ed] to get angry when told what to do" and "was diagnosed with emotional disturbance based on inappropriate peer interactions and [her] symptoms back in elementary, middle and high school." (Tr. 233).

When plaintiff submitted her application in January 2014, she lived with her mother and two siblings in an apartment. (Tr. 140, 208, 228). In September 2015, plaintiff told the ALJ that her mother's landlord required her to move because there were too many people living in the apartment. (Tr. 40-41).[3] She was temporarily living in a house owned by her boyfriend's mother, but that house was for sale.[4] (Tr. 36-39). She spent her days journaling and watching television. (Tr. 38). She earned money walking dogs, mowing lawns, and babysitting. (Tr. 39-40). Plaintiff did not have a driver's license. She testified that she passed the written portion and obtained her permit but failed the driving portion because she could not parallel park. (Tr. 41).

Plaintiff listed her impairments as depression, learning disability, anxiety and panic attacks, and chronic irritable bowel syndrome. (Tr. 199). She had difficulties remembering, understanding, concentrating, following instructions, completing tasks, and getting along with others. Her mother stated that plaintiff had a short attention span and needed help staying focused. The Field Office interviewer observed no limitations during a brief telephone interview

---

[3] The record contains two additional documents regarding plaintiff's residence. In March 2014, plaintiff's landlord documented that she was being evicted from an address on Oldenburg Ave. (Tr. 103). In July 2015, plaintiff's lawyer filed a change of address notification stating that plaintiff now resided at the same address on Oldenburg from which she was evicted in March 2014. (Tr. 128).
[4] This was her living arrangement in March 2012, as well. (Tr. 299) (treatment note documenting that plaintiff was "currently residing between her mother's place and her boyfriend's family's home.")

and described plaintiff as cooperative. (Tr. 196). At the hearing, plaintiff testified that she was unable to work fulltime because she was "too nervous," "a complete failure," and every other day experienced panic attacks that lasted 30 minutes to an hour.[5] (Tr. 43, 53).

Plaintiff received medical management from psychiatrist Daniel Mamah, M.D., and case management from Krista Cooperman. Plaintiff testified that Ms. Cooperman took her to medical appointments and encouraged her to take her medications as prescribed. Plaintiff took Prozac once a day before bed, and Aleve and Miralax as needed. (Tr. 54-55).

Vocational expert Delores E. Gonzalez, M. Ed., was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, who received special education services, graduated from high school, was able to get some good grades in college, and had no physical limitations, but who was limited to routine, repetitive, noncomplex tasks, not to exceed specific vocational preparation (SVP) level two. Ms. Gonzalez was also asked to assume that the individual was limited to no more than occasional decision-making, occasional changes in the work setting, occasional to no direct contact with the public, and occasional interaction with co-workers and supervisors. (Tr. 63). Ms. Gonzalez testified that such an individual would be able to perform work as a cleaner II (described as medium unskilled work, with an SVP of 1), a silver wrapper (light, unskilled, with an SVP of 1), or a housekeeping cleaner (light, unskilled, with an SVP of 2). (Tr. 63-64). These jobs would be available if the individual were also limited to casual and infrequent interactions with co-workers and no tandem tasks, with end-of-workday production quotas only. An individual who was absent from work two or more days a month or who was off task ten percent of the time would be unable to perform any work in the

---

[5] When asked why her treatment records indicated that she did not have such attacks very often, she stated that they had increased in frequency due to her uncertainty about housing. Id.

national economy.  (Tr. 67-68).  Similarly, a person who required redirection after 30 days on the job would be subject to termination.

### B.    Medical Evidence[6]

Plaintiff began treatment with the BJC BH Community Mental Health Center in 2007. (Tr. 301).   According to documents completed in 2012,  plaintiff had severe anxiety problems, symptoms of panic disorder, and somatoform disorder.  (Tr. 299).  She had begun managing her anxiety and panic attacks on her own with fewer requests for outside intervention from her mother, counselor, or doctors, and her symptoms continued to improve.  Id.  She was hoping to find a place to live with her boyfriend when he was released from incarceration.   In the meantime, she was concerned with the custody arrangements for his son.  She had two criminal charges in 2011 for interfering with a police officer and having alcohol in the presence of minors.  In 2012, she was expelled from Meramec Community College for her participation in a fight.  She was allowed to enroll at Forest Park Community College for the winter semester, with the condition that she meet with a counselor on campus.

Plaintiff began treatment at Midwest Psychiatry on September 14, 2012, for chronic management of mood and anxiety symptoms.  (Tr. 326-27).  On examination, psychiatrist Daniel Mamah found that plaintiff was oriented, well-dressed and groomed, and had logical, sequential speech.  She did not report symptoms of psychosis.  She had no disruption in sleep and her appetite was fair.  Her intellect was normal and her sensorium was clear.  She had restricted affect and fair insight and judgment.  Dr. Mamah diagnosed plaintiff with panic disorder with agoraphobia and mood disorder, not otherwise specified, and assigned a Global Assessment of

---

[6] Plaintiff does not challenge the ALJ's determination that her irritable bowel symptoms did not give rise to a medically determinable severe impairment.  (Tr. 14).  Although the Court has reviewed all the medical records, records for treatment of these symptoms will not be addressed here.

Functioning (GAF) score of 60.[7]  He noted that plaintiff's anxiety symptoms involved both attacks and generalized components and that her history of episodes appeared consistent with major depressive episodes but her irritability and behaviors were atypical.  She did not present any apparent risk to herself or others and was "fairly well functioning."  Plaintiff was previously prescribed the antidepressants Remeron, Zoloft, Prozac, and Risperdal, and the stimulants Concerta and Ritalin, and was presently taking Celexa.  (Tr. 326, 297).  Dr. Mamah ordered blood tests to rule out hypothyroidism and increased plaintiff's dose of Celexa.  On October 12, 2012, plaintiff reported that she had headaches and chest pains on the increased dose of Celexa and Dr. Mameh prescribed Zoloft instead.  Despite the persistence of panic and anxiety symptoms, plaintiff's mood was largely stable and her mental status examination was unremarkable.  (Tr. 325).  Two weeks later, plaintiff reported that she felt good and had not had any panic attacks, even though she had stopped taking the Zoloft because the pills got wet.  Dr. Mamah advised her to resume taking Zoloft.  (Tr. 324).

When plaintiff returned to Midwest Psychiatry in January 2013, she was feeling stressed because her boyfriend had been arrested and she was trying to raise money for his legal fees. (Tr. 323).  She had again stopped taking Zoloft, this time because she was taking cold medicine. Nonetheless, there were no reports of panic attacks and her mental status examination was again unremarkable.  During a medical visit in March 2013, plaintiff reported improvement in her mental health with Zoloft.  (Tr. 288).  In April 2013, Laura Romer, APRN, of Midwest Psychiatry, noted that plaintiff was experiencing a lot of drama and continued to be inconsistent

---

[7] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairments in functioning due to physical or environmental limitations are not considered.  American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000) (DSM-IV-TR).  A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Id. at 34.

in taking her medication. (Tr. 322). Plaintiff reported that she had poor focus and low motivation, leading to a poor grade in one of her classes. She also had some issues with motivation and anger. On examination, her mood was up and down and her insight and judgment were poor. She was assigned a GAF of 50. In May 2013, plaintiff was "generally doing well." (Tr. 316-21). She had no significant depressive symptoms. Although she had some irritability and mild anxieties, "the latter symptoms appear[ed] to be in remission." (Tr. 319). Dr. Mamah recommended counseling for anger and behavior management, but plaintiff refused. Id. She was taking her medication as prescribed. Plaintiff presented with essentially normal mental status, with appropriate and well-modulated affect. Her GAF was 65.[8] (Tr. 320). In August 2013, plaintiff reported that she was doing well and had no major mood or anxiety symptoms or significant stressors. She was planning to go to school in the fall. (Tr. 334-39). Her condition was stable and her GAF was 70. Her clinical presentation was similar in November 2013. (Tr. 340-45). She reported that she had done well on her midterms. Dr. Mamah again recommended individual counseling to help her cope with general stressors. (Tr. 343). Her GAF remained at 70. (Tr. 344).

Dr. Manah saw plaintiff five times in 2014. In February, he noted that plaintiff was more irritable and was snapping at people. She was also more depressed with occasional sleep interruption. (Tr. 471-73). She did not identify any increased stressors and school was still going well. She was taking her medications. Although her mental status examination was unremarkable, Dr. Mamah assessed that her condition had worsened and started her on

---

[8] A GAF of 61-70 corresponds with "Some mild symptoms . . . OR some difficulty in . . . social, occupational, or school functioning, . . . but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

Lamictal.[9] Her GAF was 55. (Tr. 472). In May, plaintiff reported that she was doing fairly well and had not had any significant mood swings since starting the Lamictal. (Tr. 474-77). She had left school after failing some classes and was working fulltime at McDonald's. On examination, she had normal speech and coherent thought processes, her insight and judgment were good, and she was oriented. Her memory was intact, her attention and concentration were normal, and she displayed an average vocabulary. Her mood was "ok" and her affect was euthymic. (Tr. 479). Her GAF was 70 and Dr. Mamah assessed that she was "doing relatively well." (Tr. 476). In August 2014 (Tr. 478-81), plaintiff was still "doing relatively well." (Tr. 478). Work at McDonald's was stressful, she said, and she had had one panic attack since her last visit. On examination, her mental status remained unremarkable. Her GAF was 70 and Dr. Mamah found that she had "no major symptoms." (Tr. 480). Plaintiff reported in October 2014 that she was working overnight shifts and looking for other work. (Tr. 482-85). She could not recall having any panic attacks, although she had one episode of feeling faint. She reported having some mood swings, which she described as not severe. Her mental status examination was unremarkable. Dr. Mamah increased the dosage of plaintiff's Lamictal. (Tr. 484). In December 2014, plaintiff reported that she had quit McDonald's and was working at Wal-Mart. (Tr. 487-89). She had some mood swings, but they did not last long. It was noted that plaintiff was "social but complained of up and down moods" and had not been taking her medication as instructed. (Tr. 489). She was encouraged to begin walking to improve her moods. Her Lamictal dosage was increased. Her mental status examination was unremarkable.

Dr. Manah saw plaintiff on four occasions in 2015. In February, she reported that she thought she would be fired from Wal-Mart for missing work, which she attributed to stress or

---

[9] Lamictal is used to increase the time between episodes of depression, mania, and other abnormal moods in patients with bipolar disorder. See https://medlineplus.gov/druginfo/meds/a695007.html (last visited on December 19, 2017).

being too cold. (Tr. 492-94). She stated she felt some generalized stress and depression and was not sleeping well. She had stopped taking the Lamictal, which she thought made her moody. (Tr. 492). Her mental status evaluation was unremarkable and Dr. Manah assessed her condition as stable. (Tr. 494). He prescribed trazadone to help with sleep and again recommended counseling to her. Id. In March, plaintiff reported that she was no longer working and she was worried about finding another job. (Tr. 497-99). She had daily periods of depression. She wanted a medication "that makes [her] happy" and asked for Xanax, which a friend had given her. (Tr. 497). Her sleep had improved after taking trazadone a single time and she had started counseling. Other than an anxious mood, her mental status examination was unremarkable. (Tr. 498). Dr. Manah noted that her ability to manage daily stressors was poor and decided to switch her antidepressant from Zoloft to Prozac. (Tr. 499). In April, she reported that she was "doing much better with current medication regimen." She had no significant mood symptoms. (Tr. 502). She would begin a job at Schnucks in the next week. Her mental status examination showed no abnormalities and she had a GAF of 70. In August, plaintiff reported that her mood had been generally good and she was sleeping well. (Tr. 507). She had recently had a panic attack when working the drive-thru at Dairy Queen. Her mental status evaluation was unremarkable and her GAF was 70. (Tr. 508).

### C. Opinion Evidence

On February 5, 2014, State agency psychologist Sherri Bassi, Ph.D., completed a Psychiatric Review Technique form based on a review of the record. (Tr. 74-76). Dr. Bassi concluded that plaintiff had medically determinable impairments in the category 12.06 (anxiety-related disorders). She opined that the medical records did not support plaintiff's allegations regarding the severity of her symptoms and that plaintiff's mental allegations were "considered

non-severe." (Tr. 75). The ALJ afforded minimal weight to Dr. Bassi's opinion because she did not have the opportunity to review later records which documented plaintiff's treatment for mood and anxiety disorders. (Tr. 19).

On July 24, 2015, Dr. Manah completed a Mental Residual Functional Capacity Questionnaire. (Tr. 432-36). He listed plaintiff's diagnoses as mood disorder, not otherwise specified, and panic disorder. Her medications were Prozac and trazodone and they did not cause side effects. In response to a question regarding the clinical findings that demonstrated the severity of plaintiff's impairments, Dr. Manah stated "some irritability and generalized anxiety." (Tr. 432). Her prognosis was good. Id. On a checklist of signs and symptoms, Dr. Manah stated that plaintiff displayed mood disturbance, emotional stability, and recurrent severe panic attacks occurring at least once a week, on average. (Tr. 433). Dr. Manah opined that plaintiff's ability to do work-related activities on a day-to-day basis in a work setting was limited but still satisfactory with respect to most mental abilities needed to do unskilled, semiskilled, and skilled work. He also opined, however, that as a result of her irritability and anxiety, plaintiff was seriously limited, but not precluded, in six areas: working in coordination with or proximity to others without being unduly distracted; completing a normal workday and work week without interruption from psychologically based symptoms; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; dealing with normal work stress; and interacting appropriately with the general public. (Tr. 434-35). She did not have low IQ or reduced intellectual functioning. (Tr. 435). On average, plaintiff would be absent from work two days per month due to her impairments or treatment. (Tr. 436). She was not a malingerer.

Id. The ALJ found that the level of limitation endorsed by Dr. Mamah was inconsistent with his GAF scores and findings on examination and gave little weight to his opinion. (Tr. 18-19).

### III. Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act. See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations."

Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v.

<u>Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." <u>Id.</u>; <u>see also</u> <u>Stewart v. Sec'y of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. <u>Buckner v. Astrue</u>, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. <u>Id.</u>; <u>see</u> <u>also</u> <u>McNamara v. Astrue</u>, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. <u>The ALJ's Decision</u>

The ALJ's decision in this matter conforms to the five-step process outlined above. The ALJ found that plaintiff had not engaged in substantial gainful activity since November 17, 2013, the application date. (Tr. 14). At steps two and three, the ALJ found that plaintiff had severe impairments of agoraphobia with panic disorder, mood disorder, and intellectual disability, and that none of her impairments or combination of impairments met or was medically equivalent to a listed impairment.[10] <u>Id.</u>

The ALJ next determined that plaintiff had the RFC to:

---

[10] The ALJ analyzed plaintiff's eligibility for Listing 12.04 (depressive, bipolar and related disorders), Listing 12.05 (intellectual disorders), and Listing 12.06 (anxiety-related disorders), and the "paragraph B" and "paragraph D" criteria. (Tr. 14). For the purposes of considering the criteria of paragraphs B and D, the ALJ found that plaintiff displayed mild restrictions in her activities of daily living; moderate limitations in social functioning; and moderate difficulties in maintaining concentration, persistence, and pace. (Tr. 14-15). Plaintiff had not had episodes of decompensation of extended duration. <u>Id.</u>

perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to routine, repetitive tasks, and a work environment that requires no greater than occasional decision-making and occasional changes in the work setting. The claimant should have no more than occasional interaction with the public, co-workers, and supervisors.

(Tr. 16).

In assessing plaintiff's RFC, the ALJ summarized the medical record and opinion evidence, as well as plaintiff's own statements regarding her abilities, conditions, and activities of daily living. While the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ also determined that plaintiff's statements regarding their intensity, persistence and limiting effect were "not entirely credible." (Tr. 18). The ALJ found "significant the relative lack of more clinically significant findings on longitudinal examinations," and plaintiff's "ability to engage in numerous activities of daily living," attend college, and "engage[] in work activity, albeit at levels beneath substantial gainful activity levels." Id.

At step four, the ALJ concluded that plaintiff did not have any past relevant work. (Tr. 19). Based on the vocational expert's answers to hypothetical questions, the ALJ found at step five that someone with plaintiff's age, education, work experience and residual functional capacity could perform other work that existed in substantial numbers in the national economy, namely as a cleaner II, silver wrapper, and housekeeper/cleaner. (Tr. 20). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act. Id.

## V. **Discussion**

Plaintiff asserts two challenges to the ALJ's decision. First, she argues that the ALJ improperly concluded that her Verbal IQ score of 69 was not valid for the purposes of Listing 12.05C. Second, she contends that the ALJ improperly formulated her RFC.

A.    **Listing 12.05C**

To meet Listing 12.05C, "a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006). In addition, the claimant is required to demonstrate that she suffered "deficits in adaptive functioning" and that those deficits "initially manifest during the developmental period [before age 22]." Cheatum v. Astrue, 388 F. App'x 574, 576 (8th Cir. 2010) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05). To qualify for disability under a listing, a claimant carries the burden of establishing that her condition meets or equals all specified medical criteria. McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011).

The ALJ concluded that the December 2008 verbal IQ score of 69 was not a valid reflection of plaintiff's abilities. An ALJ "is not required to accept a claimant's IQ scores . . . and may reject scores that are inconsistent with the record." McKinney v. Colvin, 973 F. Supp. 2d 1011, 1026 (E.D. Mo. 2013) (quoting Miles v. Barnhart, 374 F.3d 694, 699 (8th Cir. 2004)) (alteration in original, internal quotations omitted). "Indeed, test scores of this sort should be examined to assure consistency with daily activities and behavior." Id. (quoting Miles, 374 F.3d at 699). Here, while noting that plaintiff received special education resources, the ALJ concluded that the IQ score was inconsistent with plaintiff's ability to attend community college and receive "grades in the B and C range in courses on verbal subject matter." (Tr. 19). The

verbal IQ score is also inconsistent with Dr. Mamah's assessments in September 2012 and July 2015 that plaintiff had normal intellectual functioning.[11]  (Tr. 327, 436).

Even if plaintiff's IQ score is accepted as a valid reflection of her abilities, she does not have the necessary deficits in adaptive functioning required to satisfy Listing 12.05.  See Cheatum, 388 F. App'x at 576.  The record demonstrates that plaintiff was able to take public transportation, attend college, and find employment.  While evidence of plaintiff's ability to perform gainful activity is not relevant if she otherwise meets the requirements of Listing 12.05, it is relevant to establishing whether she has the necessary deficits in adaptive functioning.  Id. at 577 n.3.  The ALJ's determination that plaintiff did not meet Listing 12.05 is supported by substantial evidence in the record as a whole.

### B.  The ALJ's RFC Determination

Plaintiff argues that the RFC assessed by the ALJ is not supported by "some" medical evidence as required under the standards contained in Singh v. Apfel, 222 F.3d 448 (8th Cir. 2000) and Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  In particular, plaintiff argues that the ALJ improperly assessed her credibility and did not accord proper weight to the opinion of her treating psychiatrist.

The "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his

---

[11] The IQ scores were obtained in a "re-evaluation" completed on December 2008.  (Tr. 170).  While not addressed by the ALJ, the Court notes that there is no information regarding the assessment instrument, the evaluator's opinion of the validity of the scores, or how the scores compare to prior assessments.

limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (quotation and citation omitted). Although the ALJ must assess a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. See Lauer, 245 F.3d at 704; Singh, 222 F.3d at 451. Thus, an ALJ is required to consider at least some supporting evidence from a medical professional. Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record). Where an ALJ fails to properly support the RFC with medical evidence, it cannot be said that the resulting RFC determination is supported by substantial evidence on the record as a whole. Holmstrom v. Massanari, 270 F.3d 715, 722 (8th Cir. 2001).

1.     Credibility

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). Here, the ALJ determined that plaintiff's statements regarding the intensity, persistence and limiting effects of her alleged symptoms were not entirely credible. (Tr. 18). The Eighth Circuit has instructed that the ALJ is to consider the credibility of a plaintiff's subjective complaints in light of the factors set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984); see also 20 C.F.R. §§ 404.1529. 416.929. The factors identified in Polaski include: a plaintiff's daily activities; the location, duration, frequency, and intensity of her symptoms; any precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of her medication; treatment and measures other than medication she has received; and any other factors concerning her impairment-related limitations. See Polaski, 739 F.2d at 1322; 20 C.F.R. §§ 404.1529. 416.929. An ALJ is not, however, required to specifically discuss each Polaski factor and how it relates to a plaintiff's credibility. See Partee v. Astrue, 638 F.3d 860, 965 (8th

Cir. 2011) (stating that "[t]he ALJ is not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting a [plaintiff's] subjective complaints") (internal quotation and citation omitted); Samons v. Astrue, 497 F.3d 813, 820 (8th Cir. 2007) (stating that "we have not required the ALJ's decision to include a discussion of how every Polaski factor relates to the [plaintiff's] credibility.").

The Court reviews the ALJ's credibility determination with deference and may not substitute its own judgment for that of the ALJ. "The ALJ is in a better position to evaluate credibility, and therefore we defer to her determinations as they are supported by sufficient reasons and substantial evidence on the record as a whole." Andrews v. Colvin, 791 F.3d 923, 929 (8th Cir. 2015). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the courts] will normally defer to the ALJ's credibility determination. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) (citation omitted).

Plaintiff alleged that she had panic attacks every other day and that she was too nervous to work fulltime. (Tr. 43-44, 52). By contrast with her statements, the record shows that plaintiff had two panic attacks in August 2014 and June 2015. (Tr. 478, 507, 267). With respect to plaintiff's allegations of a disabling mood disorder, Dr. Mamah's notes reflect that plaintiff only occasionally complained of a depressed mood and irritability, and more typically presented without major mood symptoms. (Tr. 336, 341, 475, 479, 483, 493). Plaintiff also complained of agoraphobia, but Dr. Mamah's notes reflect that plaintiff spent time visiting her mother, attended college, and worked at a number of jobs involving the public. (Tr. 17). The ALJ adequately identified inconsistencies that detract from plaintiff's credibility. In addition, plaintiff was occasionally noncompliant with her medication regimen and refused to consider counseling for

anger and behavior management. (Tr. 489, 492, 319, 494). A claimant's failure to follow treatment recommendations weighs against credibility. Vance v. Berryhill, 860 F.3d 1114, 1121 (8th Cir. 2017).

Plaintiff asserts that the credibility determination is undermined by the ALJ's failure to address third-party statements from her employers and the community college. To assist the ALJ in evaluating the claimant's credibility and formulating her RFC, an ALJ is obligated to consider third party statements regarding a claimant's functional limitations. Robertson v. Colvin, No. 4:12-CV-1419-DGK, 2014 WL 106117, at *4 (W.D. Mo. Jan. 10, 2014) (citing 20 C.F.R. §§ 404.1529(c)(1)-(3), 404.1529(a), 404.1545(a)(3); SSR 85–16; SSR 96–7p; SSR 96–8p). An ALJ's failure to acknowledge a third party statement is, at a minimum, a procedural error. Id. (citing Buckner v. Astrue, 646 F.3d 549, 559–60 (8th Cir. 2011)). Whether this error is prejudicial or merely represents a deficiency in opinion-writing technique depends on a variety of considerations, including whether other distinct errors also support remand; whether the ALJ properly assessed the claimant's credibility; and whether the record evidence also discredits the unacknowledged third party statement. Id.

The Court finds that the ALJ's failure to address the third-party statements is, at most, a deficiency in opinion writing. According to the statement from Wal-Mart, plaintiff was terminated for attendance issues which plaintiff testified were due to her reliance on public transportation. (Tr. 51). Thus, the Wal-Mart statement has no bearing on plaintiff's allegations of disability. Plaintiff's employer at Dairy Queen stated that plaintiff had a difficult time focusing, made errors in delivering the correct product, and had a panic attack, while the community college records show that plaintiff received a number of accommodations. In formulating the RFC, the ALJ accounted for plaintiff's difficulties in these areas by limiting her

to simple work with only occasional contact with others. The Court agrees with the ALJ that plaintiff's allegations of limitations beyond those accounted for in the RFC are not credible. Thus, to the extent that plaintiff relies on the third-party statements to support a greater degree of limitation, the ALJ did not commit reversible error in failing to address them.

### 2.    Opinion Evidence

Plaintiff argues that the ALJ erred by discounting the opinion of her treating psychiatrist, Dr. Mamah. A treating physician's opinion must be given "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."[12] Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting Wagner v. Astrue, 499 F.3d 842, 848–49 (8th Cir. 2007)). "Not inconsistent . . . is a term used to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence (*i.e.*, it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion." Id. (quoting S.S.R. 96–2p, Policy Interpretation Ruling, Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, 1996 WL 374188 (July 2, 1996)). "Even if the [treating physician's] opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight." Id. (quoting Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007) (alteration in original)). The treating physician's opinion may have "limited weight if it provides conclusory statements only, or is inconsistent with the record." Id. (citations omitted). The ALJ "may discount or even

---

[12]This continues to be true for plaintiff's claim because it was filed before March 27, 2017. Combs v. Berryhill, 868 F.3d 704, 709 (8th Cir. 2017); 20 C.F.R. § 404.1527 ("For claims filed . . . before March 27, 2017, the rules in this section apply."); § 404.1527(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.").

disregard the opinion . . . where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id. (quoting Miller v. Colvin, 784 F.3d 472, 477 (8th Cir. 2015)).

Dr. Mamah opined that plaintiff was seriously limited, but not precluded, in six areas of functioning. (Tr. 434-35). The ALJ found that the severity of these limitations was inconsistent with the routinely unremarkable findings Dr. Mamah made during office visits. (Tr. 18-19). As reviewed above, Dr. Mamah generally found that plaintiff was stable with few symptoms and mental status examinations within normal limits. The ALJ also cited the relatively high GAF scores Dr. Mamah assigned to plaintiff. Id. While noting that GAF scores are "highly subjective and include[] factors (such as unemployment and financial circumstances) that are not relevant to the issue of disability," the ALJ nonetheless stated that the higher GAF scores here "suggest a lack of disability." (Tr. 19 at n.1). Plaintiff argues that this statement constitutes legal error. In context, it is evident that the ALJ did not rely on plaintiff's GAF scores to determine that she is not disabled. Rather, as the ALJ noted, the GAF scores were consistent with the treatment records, which indicated that plaintiff had mild and transient symptoms. (Tr. 19). The ALJ adequately set out inconsistencies between Dr. Mamah's opinion and other substantial evidence in the record and, contrary to plaintiff's argument, Dr. Mamah's treatment notes provide medical evidence to support the ALJ's RFC determination, as required by Lauer and Singh.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**. A separate Judgment shall accompany this Memorandum and Order.


/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of January, 2018.